The master having made a report under the reference ordered at June Term, 1831, to which the defendants having excepted, the cause has been again brought on upon the report and exceptions, and on the motion of the plaintiff for further directions.
The report finds the balance of the proceeds to the personal estate, exclusive of the slaves, to be $416.93, on which interest is computed from April, 1821, that being the time when the executors stated and returned their account current. The master finds that this sum is not now in the hands of the executors, but was paid to the other defendants, the trustees of the Society of Friends, or by their order, and was in fact applied in paying the sum agreed to be given upon the compromise made with Willie Wright.
To the whole of this charge both the executors and the trustees except; the latter, because the money was never in their hands, and the former because it was paid with the privity of the trustees, and on their behalf, in good faith on the part of the executors, under the belief that it belonged to the society as owners of the slaves and that Wright was the agent of the plaintiff.
The report also finds that in 1816 the executors delivered all the slaves to the trustees, and that in 1819 one of the slaves was sent out of the State to parts unknown, or was permitted by the defendant to go, so that the plaintiff cannot now get the possession of him, and that pending this suit, viz., in 1825, three others of them were in like manner sent or permitted to go away. The master charges the defendants with the *Page 360 
(450) value of those slaves as of the time they were sent away, and with interest from that time. He also charges them with reasonable hires of all the slaves while in their possession, including those sent away up to the time they went, and interest on those hires as they become annually due.
To this part of the report the executors and trustees also respectively except, the former because they properly assented to the legacy to the society, and delivered the slaves to the trustees when their duty ceased, and they were no longer liable for either the slaves or their profits, since if a trust resulted to the next of kin, it arose out of the legal estate in the agents of the society; and the latter, because they have personally derived no profits from the slaves, but allowed them to enjoy the profits of their own labor, and to leave the State under the honest belief that they belonged to the society, and that such was the intention both of the society and the testator. And as to the interest, both sets of defendants except upon the common ground that it is not chargeable on rents and hires.
To the proper consideration of the exceptions, it is necessary to advert to the pleadings and to the transactions previous to this suit. Thomas Wright died in April, 1816, and by his will bequeathed his slaves to the Society of Friends of New Garden Monthly Meeting, or their agents and successors, and gave the residue of his personal property to the slaves themselves. This has been heretofore declared to be a trust for emancipation, and, as that was against the policy of the law, that it was void, and resulted to the next of kin. The executors, however, delivered the slaves to the agents in August, 1816. On 16 February, 1818, the present plaintiff, as sole next of kin of the testator, filed her bill against the executors for an account of the personal estate, and alleging that the trust of the slaves resulted to her. The plaintiff is a widow residing in Kentucky, and appointed Willie Wright, residing in Guilford, her agent to prosecute her suit in Guilford and receive the estate that might be coming to her. Wright was an incapable and distressed man, and, (451) as the event proved, faithless as an agent. The executors put in no answer to that bill at Spring Term, 1818, but got leave to answer at the next term. At the next term they still delayed to answer. Yet Wright did not set down the bill as confessed, but enlarged the time to another term. Before that arrived he was put in prison for debt, at whose instance does not clearly appear. But there is much reason to believe that these defendants were connected with it, for no communication for a settlement seems to have been had until he was imprisoned. On 12 December, 1818, the executors engaged with one Draughn, acting on behalf of Wright, for a compromise, and then advanced $60 towards it, for the purpose of releasing him from jail which was to be valid in case Wright should accede to it, and the residue should *Page 361 
then be paid. The next day Wright, then in jail, assented to the arrangement, and it was concluded by the execution of two papers by him, one dated 12 December, 1818, purporting to be a general release to the executors, on the part of the plaintiff, of all demands for any part of the estate of the testator, and the other dated 14 December, 1818, in consideration of $450 then paid, to discharge the suit, and to sell and assign to the executors all the interest and claim of the plaintiff in and to the slaves and all other parts of the estate. This agreement was made by the executors personally, and by the advice and with the assistance of the defendant, George Swain, who acted on behalf of the society and their trustees, who state in their answer that they advanced part of the money. The sum paid to Wright does not precisely appear. Draughn says it was $410, including the previous $60, while Hubbard, a witness for the defendants, and a subscribing witness to one of the instruments, says it was $300 or thereabouts, for part of which a note was given. At Spring Term, 1819, the suit was dismissed under the agreement, by rule of court. This transaction has already been declared not to be a bar to the plaintiff, upon the ground that Swain and the executors then knew that the plaintiff had revoked the authority to Wright.
In July, 1824, this suit was brought, having the same objects (452) with the former, and making the agents of the society defendants, and charging that the compromise with Wright was unduly obtained, after the plaintiff had revoked his authority, and the other parties had knowledge of the fact. Both the executors and the agents by their answer insist upon the compromise and release as a bar, and also upon the title of the society to the slaves under them, and under the bequests of the will, upon the ground that the society controlled them, and does hold them as property, though they do not apply the profits to the use of the individual members or that of the society as a religious association, but as a charity for those slaves or others. The executors deny that Jim has been sent away by their privity, and say, although they are Friends and members of the same meeting, that they had no control over the slaves, but the agents only. And the agents, insisting upon a general property, say of course they had a right to send him or allow him to go away.
As a general rule, it must be admitted that executors are bound, at their peril, to pay money and deliver the property to the proper persons entitled to it, as next of kin or legatees. It may be admitted, as an exception, that executors in trust, for a charity, under a will of doubtful construction, or where the validity of the charity as a question of law is doubtful, who act honestly, though erroneously, will be protected in the application of the funds until demand from the person entitled. Upon this principle, perhaps, the executors might be excused for delivering the slaves in August, 1816, to the other defendants, though the Court *Page 362 
cannot recognize the purpose of emancipation, there being no evidence of meritorious services, as being in this State a moral and charitable object in a general sense, much less a charity in a legal sense, and it is hard to suppose any citizen of North Carolina, and especially of the Society of Friends, to be so little informed of the law upon this subject as not to be certain of its illegality at least. But the case does not (453) require an opinion upon that point, nor even upon the effect of emancipation of the slaves, promised or permitted by the agents, before notice of the plaintiff's rights, either upon their own responsibility or that of the executors; for it does not appear that any of them have been emancipated at any time, and it does appear that the parties had full notice of those rights before any of the slaves were sent away. Three of them, indeed, have been put beyond the plaintiff's reach pending this suit, in which the defendants assert a right to withhold them from her, as being legally and beneficially their property. This would be a conversion at law. The fourth was sent off in 1819, in the interval between the termination of the first suit, and the bringing of this. Can that be regarded as bona fide, and arising from an honest mistake? I must here remark that Haywood v. Craven, 4 N.C. 360, was decided in this Court in July, 1816, in which the nature of such trusts was determined. Everybody deemed the question one of great importance, and perhaps no decision was ever sooner and more generally known, either as to the point of it or its principles. In possession of the knowledge of it, how stands the conduct of the defendants? They may be considered as acting upon a motive of praiseworthy benevolence in the abstract, in the endeavor to free their enslaved fellow-creatures; but in reference to the law of their country, and the duty of obedience to it, and in reference to the rights of property of the plaintiff, they cannot pretend good faith. They acted in bad faith in respect of those obligations. They endeavored to fortify their asserted rights of property by the release and assignment by the plaintiff of her right of property. They attempted to give that character to instruments obtained from one to whom she had given authority, and from whom she had withdrawn it, with their knowledge, in the hope she could not prove such knowledge on their part, and, therefore, that she would be bound notwithstanding the revocation. And if Wright had still authority, the compromise was made upon such terms and under such circumstances that it could not (454) stand in this Court, but would be set aside as unduly obtained upon inadequate consideration and by taking advantage of it not producing the distresses of the agent. The first suit had pended nearly a year without an answer, and without any steps towards a settlement. We then find the agent in jail, and immediately the compromise is proposed, and the plaintiff's money paid for his discharge; and the whole *Page 363 
sum paid is less than the cash balance in the executors' hands, to which the plaintiff was entitled; in consideration of which she is made to release all claims to the residue of the estate and to convey the slaves specifically. Upon a bill filed to get rid of such a deed, upon the single point of fraud and imposition, the plaintiff must have been relieved, which is an answer to all that can be said about the good faith of the parties. If the executors had come forward as persons standing indifferent between the claimants, according to their duty, and said, "We have so much money, which we are ready to pay you; but as to the slaves, we cannot deliver them to you, because we have, as we thought we ought, already delivered them to the agents of the Society of Friends; and if there is a trust for you, apply to them, or for relief against them," it would have made a different case. But the executors and agents made a common cause, and this unfair compromise is effected, and an assignment of the slaves is actually made to the executors themselves, no doubt for the protection of the agents. Each of the parties is, in such a case, liable to the true owner for all subsequent conversions or misapplications of the property, though they may not be liable in equal degree, but the one after the other. Here all the parties are before the Court, and the plaintiff seeks the specific property. As far as it can be had, she is entitled to it; but for any parts of it that have been eloigned, she is entitled to compensation from the last holder and actual wrong-doer; and if satisfaction cannot be obtained from him, then she has a right to look to all the others by whose more remote agency the injury to her has arisen. That compensation consists in the value of the slaves withheld from her, and interest on it.
As to the sum paid to Wright, it being wrongfully paid by the (455) executors, it must be considered as between them and the plaintiff, to be still in their hands; but as between them and the other defendants, the agents, it was paid with the privity and by the request of the latter, and for the confirmation of their pretended title to the negroes, and, therefore, was a payment to their use, and the agents must be liable first for it. It is true that one of the defendants, Mr. Swain, was not appointed one of the agents of the meeting until 26 December, 1818, but he is equally liable with the others for the whole, for he was the individual who made the compromise and payment, acting on behalf of the meeting of which he was a member, and the other agents and he, as agent, subsequently ratified the whole, and all four of the slaves were sent away after he had charge of them.
As to the hires and the interest on them: Hire is the natural profit of slaves, and if not made, ought to have been made, and the owner is entitled to receive it from those who withhold the slaves themselves. It is no answer to say that the negroes worked for themselves. That was *Page 364 
as much against law and public economy as against the individual rights of the plaintiff. It certainly is not the general rule to charge interest on the annual profits, nor would it be allowed here if the defendants had rendered a fair account or allowed the case to be decided simply on the original rights of the parties. But the extreme injustice done to the plaintiff in the beginning, in denying her right, in taking advantage of the incapacity, the faithlessness and necessities of her agent, to extort a release and a conveyance from him, upon payment only of a very small part of what was due to the plaintiff, and after they knew that she had appointed another attorney, and the attempt to set those deeds up as a bar in this suit, and in the meanwhile to send off some other of the slaves beyond the jurisdiction of the court, all together constitute so gross a case of bad faith, and willful resistance to the cause of justice, and the claims of property as acknowledged and guaranteed by the laws, as subjects the defendants to account upon the most rigorous principles, and renders them justly chargeable with the highest hire, (456) and interest on it. For which reasons, all the exceptions are overruled and the report confirmed, and the plaintiff must be declared entitled to all the slaves reported to be yet in this State, and to recover from all the defendants the sums of money reported to be due for the residue and for the value of the four slaves sent away, and the hires of all the others, and interest upon those several sums; for which however, the defendants, the agents of the society, are liable to her in the first place, and therefore execution will issue therefor immediately against them; and if upon return thereof it should appear that satisfaction of the whole or any part thereof cannot be had from them, that then the plaintiff shall have execution against the other defendants for the deficiency then remaining.
When this cause was before the Court, upon the hearing in 1831, a doubt was entertained upon the right of the testator's widow to a share in this property, as not being effectually disposed. The point has been since much considered, and finally decided against the right in Craven v. Craven,ante, 338. So that the bill, so far as it seeks to recover anything as belonging to the widow by her administrator, must be dismissed.
PER CURIAM. Bill dismissed.
Cited: Ford v. Whedbee, 21 N.C. 21; Brown v. Brown, 27 N.C. 137;McCall v. Clayton, 44 N.C. 423; Phillips v. Hooker, 62 N.C. 196; Brysonv. Lucas, 84 N.C. 687; Cadell v. Allen, 99 N.C. 547; Russ v. Harper,158 N.C. 450; Elmore v. Byrd, 180 N.C. 127. *Page 365